FILED

2011 Jan-19  PM 03:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **STRATEGIC SYSTEMS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-09-S-939-NE** |
| | ) | |
| **OCTATRON, INC., and** | ) | |
| **CHANG INDUSTRY, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Strategic Systems, Inc., filed this case on May 13, 2009.[1]  Plaintiff's amended complaint asserted claims against defendants Octatron, Inc. ("Octatron") and Chang Industry, Inc. ("Chang"), for breach of an implied warranty of merchantability and breach of an implied warranty of fitness for a particular purpose.[2] Plaintiff's claims against Chang later were dismissed.[3]  The case presently is before the court on the motion for summary judgment filed by defendant Octatron.[4]  Upon consideration of the motion, briefs, and evidentiary submissions, the court concludes the motion is due to be granted.

---

[1] *See* doc. no. 1 (Complaint).

[2] *See* doc. no. 8 (Amended Complaint).

[3] *See* doc. no. 52 (Order granting Chang's motion for summary judgment and dismissing all claims against Chang).

[4] Doc. no. 38.

# I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

---

[5] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is *material* to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking

"whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

In 2004, plaintiff, Strategic Systems, Inc. ("SSI"), began developing a new

product called the "Range in a Box" ("RIAB"), which was designed for use by

military firing ranges.  The RIAB system contained twenty-four "target lifting

devices" that were designed to raise and lower targets, collect data derived during

range tests, and deliver the data to a laptop computer so that it could be analyzed by

test administrators.  SSI hoped to distinguish the RIAB system from similar,

competitive products by designing the RIAB to operate on a completely wireless

basis.[6]

To accomplish that goal, SSI sought to implement wireless "mesh" technology.

---

[6]Defendant's evidentiary submission, Exhibit A (Deposition of Michael Hofmeister), at 26-27, 32.

3

The mesh technology would allow multiple routers connected with multiple target lifting devices to not only communicate with the same central computer, but also to communicate with each other.[7]  In a mesh system, elements of the network can be added or removed at any time without necessitating significant reconfiguration of the system.  The mesh system also allows a user to deploy an unlimited number of target lifting devices in the field at any given time.[8]  The technical performance of a wireless mesh network is completely differently from that of either a hard-wired ethernet network or a regular "Wi-fi"-type wireless network.  The rate of data loss can range anywhere from 100 to 1,000 times greater in a mesh network than in a regular wireless network, and the underlying application software must be rewritten to accommodate that loss.[9]

In September of 2005, SSI entered into a contract with the United States Army to supply two RIAB systems to the 1st Armored Training Brigade at Fort Knox, Kentucky, within 120 days.[10]  At the time it entered into this contract, SSI still was experiencing some problems with the wireless component of the RIAB system.[11]

---

[7]*Id.* at 45-46.

[8]Defendant's evidentiary submission, Exhibit D (Deposition of Simon Wong), at 15.

[9]*Id.* at 198-203, 224.

[10]Defendant's evidentiary submission, Exhibit E (Rule 30(b)(6) Deposition of Michael Hofmeister), at 9-15 and Exhibits 1-3.

[11]Defendant's evidentiary submission, Exhibit B (Deposition of Nathan Alexander), at 102-03.

Specifically, while the system worked well when it was hard-wired, the target lifting devices did not communicate well with each other when the system was wireless.[12] SSI had attempted to solve the problem by using another company's communications device, but had not had any success.[13]

In the meantime, defendant, Octatron, Inc. ("Octatron"), had been developing a wireless mesh device called a "NetWeaver."  In October of 2005, Octatron representatives — who included Tom Boyle and Randy Earp, both of whom were salesmen, and Simon Wong, an engineer with chief responsibility for developing the NetWeaver product — were at Fort Knox demonstrating the wireless mesh capabilities of the NetWeaver with voice-over IP phones and cameras.  Nathan Alexander, an engineer and software developer for SSI, also was at Fort Knox during the same time period, along with SSI's president, Michael Hofmeister.[14]  Alexander and Hofmeister viewed the NetWeaver demonstration and subsequently discussed with Wong whether the NetWeaver would work with the RIAB system to provide wireless mesh capabilities.[15]

On approximately October 20, 2005, after the demonstration in Fort Knox, SSI

---

[12]*Id.* at 54-55, 61-62, 102-03.

[13]*Id.* at 54-62.

[14]First Hofmeister Deposition, at 53-56.

[15]Alexander Deposition, at 67-68.

sent Octatron some samples of one of the components of the RIAB system, so that Octatron could determine if those components would be compatible with the NetWeaver.   Wong ran a compatibility test and determined that that particular component would be compatible with the NetWeaver.[16]  Even so, Octatron never received any other technical specifications from SSI about the RIAB system as a whole.[17]

SSI subsequently requested Octatron to send it four NetWeavers to try out, and Octatron shipped the four NetWeavers to SSI on November 10, 2005.[18]  Octatron invoiced SSI for those four NetWeavers on November 21, 2005.  SSI paid that invoice on January 4, 2006.  SSI sent Octatron a purchase order for two more NetWeavers on December 2, 2005.  Octatron invoiced SSI for those two NetWeavers on December 10, 2005, and SSI paid the invoice on February 3, 2006.  Octatron sent SSI an invoice for three more NetWeavers on January 6, 2006, and SSI paid the invoice on April 28, 2006.   Octatron sent SSI an invoice for another three NetWeavers on January 19, 2006, and SSI paid the invoice on February 17, 2006. (The record does not contain a purchase order for the NetWeavers covered by the January 6 and 19 invoices.)  SSI sent Octatron a purchase order for another two

---

[16]*Id.* at 80-84 and Exhibit 2.

[17]Wong Deposition, at 208-09.

[18]Alexander Deposition, at Exhibit 10.

NetWeavers on February 10, 2006. Octatron sent SSI an invoice for those two NetWeavers on the same date, and SSI paid the invoice on March 29, 2006. Finally, on August 10, 2006, SSI sent Octatron a purchase order for fourteen additional NetWeavers. Octatron sent SSI an invoice for those fourteen NetWeavers,[19] and SSI paid that invoice on October 10, 2006.[20]

After receiving its first order of four NetWeavers, SSI tested them and immediately discovered that the NetWeavers did not communicate properly with the RIAB system.[21] Beginning in November 2005, SSI and Octatron worked jointly to resolve the communication problems so that the RIAB and NetWeaver systems could effectively work together, but their attempts ultimately were unsuccessful.[22] In May of 2006, the RIAB system experienced significant failures during a field test at Fort Knox. SSI attributes those failures to the NetWeaver.[23] Following an additional field test in July of 2006, Octatron reported that communication problems persisted. Octatron hypothesized that the problems might be attributable to failure of the target to properly communicate with the NetWeaver, failure of the NetWeaver to receive the

[19]The invoice for the fourteen NetWeavers is dated February 10, 2006, but the court concludes that must be a typographical error, because the purchase order for those NetWeavers was not even sent to Octatron until August 10, 2006.

[20]*See* Hofmeister Deposition, at Exhibit 1.

[21]Alexander Deposition, at 113-16 and Exhibits 11-12.

[22]Alexander Deposition, at 133, 157-59; Wong Deposition, at 112-13.

[23]Hofmeister Deposition, at 132-34 and Exhibit 18.

target's transmission, increased range between the two systems due to elevated humidity, and changes in battery level.[24]

Because SSI and Octatron never could find a way to make the two systems work in a compatible manner, SSI eventually began using a different product, the Hautespot router, to perform the wireless routing functions for the RIAB.[25]   The Hautespot network was more like a standard Wi-fi network, and it could only network four devices at one time.[26]   The differences between the Hautespot wireless technology and the NetWeaver wireless mesh technology were such that the technologies could not be functionally compared.  In other words, just because the RIAB system functioned with the Hautespot wireless router did not mean that it would also function with mesh network.[27]

## III. DISCUSSION

Plaintiff and defendant never entered into a written contract for the purchase and sale of NetWeaver devices.  Therefore, plaintiff's claims are based solely on violations of implied warranties of merchantability and fitness for a particular purpose, both of which are found in Alabama's version of the Uniform Commercial

---

[24]Hofmeister Deposition, at 139-44 and Exhibits 20 and 21.

[25]Hofmeister Deposition, at 116-18.

[26]Wong Deposition, at 204; defendant's evidentiary submission, Exhibit F (Deposition of Christopher Gentry), at 88-90.

[27]Wong Deposition, at 204-05.

Code ("UCC").  Specifically, § 7-2-314 of the Alabama UCC provides that, "[*u*]*nless excluded or modified (Section 7-2-316)*, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Ala. Code § 7-2-314(1) (1975 & 2006 Repl. Vol.) (emphasis supplied).[28]  Section 7-2-315 provides that,

> [w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is *unless excluded or modified under Section 7-2-316* an implied warranty that the goods shall be fit for such purpose.

Ala. Code § 7-2-315 (1975 & 2006 Repl. Vol.) (emphasis supplied).  Plaintiff claims

---

[28]To be "merchantable," goods

must be at least such as:

(a) Pass without objection in the trade under the contract description; and

(b) In the case of fungible goods, are of fair average quality within the description; and

(c) Are fit for the ordinary purposes for which such goods are used; and

(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) Are adequately contained, packaged, and labeled as the agreement may require; and

(f) Conform to the promises or affirmations of fact made on the container or label if any.

Ala. Code § 7-2-314(2) (1975 & 2006 Repl. Vol.).

that defendant violated both of these implied warranties by "delivering goods that were not of fair average quality and that were not fit for the ordinary purpose for which the goods were to be used,"[29] and by "selecting and delivering goods that were not suitable for the particular purpose that the Plaintiff had intended and of which the Defendants were knowledgeable."[30]

Defendant argues, however, that the implied warranties of merchantability and fitness for a particular purpose should be excluded by § 7-2-316 of the Alabama UCC. That section provides, in pertinent part, that

>    (b) When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and
>
>    (c) An implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

Ala. Code § 7-2-316(3)(b)-(c) (1975 & 2006 Repl. Vol.). The term "course of performance" is defined in the Alabama UCC as

>    a sequence of conduct between the parties to a particular transaction that exists if:
>
>    (1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

---

[29]Amended Complaint, at ¶ 42.

[30]*Id.* at ¶ 47.

> (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

Ala. Code § 7-1-303(a) (1975 & 2006 Repl. Vol.).  A "course of dealing" is defined as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."  Ala. Code § 7-1-303(b) (1975 & 2006 Repl. Vol.).  A "usage of trade" is defined as

> any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question.  The existence and scope of such a usage must be proved as facts.  If it is established that such a usage is embodied in a trade code or similar record, the interpretation of the record is a question of law.

Ala. Code § 7-1-303(c) (1975 & 2006 Repl. Vol.).

The relevant portion of § 7-2-316 has not often been elucidated by Alabama case law.  The official comments to the section, however, shed some light on the proper interpretation of the statutory language.  The pertinent comment states:

> Under subsection (3)(b) warranties may be excluded or modified by the circumstances where the buyer examines the goods or a sample or model of them before entering into the contract.  "Examination" as used in this paragraph is not synonymous with inspection before acceptance or at any other time after the contract has been made.  It goes rather to the nature of the responsibility assumed by the seller at the time of the making of the contract.  *Of course if the buyer discovers the defect and uses the goods anyway*, or if he unreasonably fails to examine the

11

goods before he uses them, *resulting injuries may be found to result from his own action rather than proximately from a breach of warranty*.

Ala. Code § 7-2-316(3)(b) cmt. 8 (1975 & 2006 Repl. Vol.) (emphasis supplied).

Defendant argues that the implied warranty of merchantability and the implied warranty of fitness for a particular purpose do not apply in this case because plaintiff was aware of any alleged defects before it purchased the NetWeavers, and because the parties' course of dealing and course of performance excluded any implied warranties.   Indeed, the evidence demonstrates that plaintiff was aware that the NetWeaver did not communicate effectively with its RIAB system as early as mid-November of 2005, when it received and tested its first shipment of four NetWeavers. Even so, plaintiff not only paid for the four NetWeavers it received in November 2005, it also ordered, received, and paid for *ten* additional NetWeavers before April 28, 2006.   Between November of 2006 and April of 2006, plaintiff and defendant worked together to alleviate the communication problems between the NetWeaver and the RIAB system, but none of the efforts were successful.   The RIAB system then failed in a May 2006 field test, and SSI blamed the failure on the NetWeaver.   The RIAB system failed again in a July 2006 field test, and defendant suggested that the failures could have resulted from multiple possible causes, including inability of the NetWeaver to communicate effectively with the target devices.   Despite the failures

12

experienced in May and July of 2006, however, plaintiff ordered an additional *fourteen* NetWeavers on August 10, 2006, and it paid for those NetWeavers on October 10, 2006.

These facts indicate that plaintiff examined the NetWeaver before purchasing it, that plaintiff's examination in fact revealed that the NetWeaver did not communicate effectively with plaintiff's RIAB system, and that plaintiff nonetheless chose not only to follow through with its original purchase of NetWeavers, but also to purchase a total of twenty-four additional NetWeavers. Thus, the implied warranties upon which plaintiff bases its claims are excluded under Alabama Code § 7-2-316(3)(b). Furthermore, plaintiff's continued purchases of NetWeaver devices despite knowledge that the devices did not communicate effectively with its RIAB system constitutes a course of dealing and/or course of performance that justifies exclusion of the implied warranties under Alabama Code § 7-2-316(3)(c).

Plaintiff's arguments to the contrary are unavailing. Plaintiff first asserts that it did not, in fact, have an opportunity to inspect the NetWeavers prior to purchasing them. Plaintiff's explanation of this assertion is confined to its first purchase of four NetWeavers in November of 2005. Plaintiff correctly points out that it did not have an opportunity to inspect those four NetWeavers before it *ordered* them. Even so, plaintiff indisputably was aware of the communication problems between the

NetWeaver and the RIAB system before it *paid for* its first order of four NetWeavers, and certainly before it ordered and paid for twenty-four additional NetWeavers during approximately the next year.

Plaintiff also asserts that its course of performance and course of dealing with defendant do not warrant exclusion of the implied warranties. According to plaintiff, it continued to purchase NetWeavers after it discovered the communication problems because it already had so much time and money invested in trying to make the NetWeaver work with the RIAB system that it seemed "more prudent" to continue to attempt to resolve the communication problems rather than abandoning the project altogether, especially considering that plaintiff was under time constraints to produce the RIAB pursuant to its agreement with the United States Army at Fort Knox.[31] Plaintiff "anticipated that if it purchased more NetWeavers from Octatron, this good faith gesture would instill confidence in Octatron and help it to resolve the situation with the NetWeaver as fast as possible."[32]  There are two major flaws with plaintiff's argument. First, and primarily, plaintiff offers no authority to support the argument. Furthermore, plaintiff cannot refute that its course of dealing and course of performance with defendant reflect that plaintiff was willing to continue to purchase

---

[31]Doc. no. 48 (plaintiff's brief), at 18.

[32]*Id.*

14

NetWeavers *despite knowledge of the communication problems between the NetWeaver and the RIAB system*.   Absent any authority to support the notion that the *reasons* for plaintiff's decision to continue to purchase NetWeavers are relevant, the court must conclude that the implied warranties of merchantability and fitness for a particular purpose are excluded under Alabama Code § 7-2-316(3)(c) (1975 & 2006 Repl. Vol.). [33]

## IV. CONCLUSION AND ORDERS

In accordance with the foregoing, the court concludes that there are no genuine issues of material fact, and that defendant is entitled to judgment as a matter of law. Accordingly, defendant's motion for summary judgment is GRANTED, and it is ORDERED that all of plaintiff's remaining claims are DISMISSED with prejudice. Costs are taxed to plaintiff. The Clerk is directed to close this file.

DONE this 19th day of January, 2011.

_____
United States District Judge

---

[33]Summary judgment is due to be granted on this basis alone.  Therefore, the court need not consider defendant's other arguments.